UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SAFECO INSURANCE COMPANY, a Washington Corporation, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 07 C 2397 ) |
| WHEATON BANK AND TRUST COMPANY, an Illinois Chartered Bank, | ) Judge Rebecca R. Pallmeyer ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Safeco Insurance Company ("Safeco" or "Plaintiff") contracted to act as a surety for Integrated Construction Technology Corporation ("ICTC"), an Illinois construction contractor. ICTC had a deposit account with Wheaton Bank and Trust Company ("the Bank" or "Defendant"), and also borrowed more than $4 million from the Bank. When a portion of the debt had matured, the Bank set off a total of $515,000 from ICTC's deposits in order to satisfy its debt. In this action, Safeco contends that this set-off was improper, and that Safeco, which has paid more than $1.6 million to satisfy ICTC's debts to subcontractors, is entitled to the deposits that the Bank seized.

In an opinion dated August 26, 2008, this court dismissed Safeco's Third Amended Complaint without prejudice, but gave Safeco a final opportunity to state a claim for relief. (Aug. 26, 2008 Mem. [75].) Safeco's Fourth Amended Complaint asserts that it is entitled to recover some of its losses from the Bank under theories of conversion (Count I) and constructive trust (Count II). Defendant again moves to dismiss, and for the reasons set forth here, that motion is denied.

## DISCUSSION

For a detailed review of the factual background, the reader is referred to the court's prior opinions, including the opinion dismissing Safeco's Second Amended Complaint, *Safeco Ins. Co. v. Wheaton Bank & Tr. Co.*, No. 07 C 2397, 2008 WL 216396, at *1-2 (N.D. Ill. Jan. 24, 2008). As

explained there, the court concluded that Safeco had failed to state valid claims for conversion and constructive trust for several reasons: First, Safeco claims it is subrogated to the rights of ICTC and its subcontractors vis-a-vis Defendant, but has consistently neglected to allege ICTC's default, a necessary precondition to subrogation.  Further, in its Response to Defendant's Motion to Dismiss Plaintiff's Third Amended Complaint, Safeco did not address the Bank's argument that its perfected security interest in the set-off funds trumps Safeco's subrogation rights.   Finally, Safeco failed to respond to the Bank's contention that the funds in ICTC's account were not "specific chattel" and that Defendant's set-off of those funds would therefore not constitute conversion.  The court addresses each of these deficiencies in light of Safeco's most recent complaint as well as Safeco's new allegations of fact in support of its constructive trust claim, presenting the facts in the light most favorable to Safeco.

**ICTC's Default and Safeco's Subrogation Rights**

Both of Safeco's claims rest on its status as subrogee to the rights of ICTC.  As explained in this court's earlier opinion, Safeco's original complaint did not establish the fourth requirement for a claim as subrogee; Plaintiff now attempts to cure that defect by alleging that Defendant's wrongful set-off caused ICTC to default on its obligation to pay its subcontractors, and as a result, Safeco was compelled to fulfill ICTC's contractual obligation to pay subcontractors who had supplied labor or materials for projects.  (4th Am. Compl. ¶¶ 10-12, 16-18.)  In support of its allegations of default, Plaintiff has attached to its Complaint claims from various subcontractors assigning to Plaintiff all rights under their contracts with ICTC in exchange for compensation owed by ICTC pursuant to those contracts.  ("Releases and Assignments," Group Ex. H to 3rd Am. Compl.)  Plaintiff alleges that Safeco's subsequent performance subrogated Safeco, by operation of law, to the rights of ICTC, the bond obligees, and the subcontractors Safeco paid and, further, that the subcontractors it paid in ICTC's stead assigned their rights to Safeco under the Bond Agreement.  *See Nat'l Shawmut Bank of Boston v. New Amsterdam Casualty Co.*, 411 F.2d 843,

848 (1st Cir. 1969) (recognizing that a surety is subrogated to the rights of the principal contractor, the project owner, and the subcontractors and suppliers the surety has paid). (4th Am. Compl. ¶¶ 12, 14-17.) No greater specificity is required at this stage to give Defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554 (2007).

**The Perfected Security Interest**

The Bank contends that, as the holder of a perfected security interest in the deposited funds, it possesses rights superior to any conflicting security interest belonging to Plaintiff as subrogee to ICTC's rights as trustee. (Def. Reply at 8.) On January 27, 2005, Defendant and ICTC signed a Commitment Letter granting Defendant a "Blanket Lien on all general business assets of the Borrower," and providing that "[t]he Borrower shall maintain its primary local deposit and disbursement accounts at the Bank." ("Commitment Letter," Ex. D to 3d Am. Compl.) This security interest in ICTC's assets was automatically perfected when Defendant took possession of the funds via deposits to ICTC's account. *See* 810 ILCS 5/0-312(b)(1); 810 ILCS 5/9-314(a). In its most recent Complaint, Plaintiff does not dispute that Defendant possesses a perfected security interest, but argues that as subrogee to ICTC's rights, its interests are equitable in nature and thus prevail over Defendant's rights, which are governed by Article 9 of the Uniform Commercial Code. *Nat'l Shawmut Bank*, 411 F.2d at 846 (surety's subrogation rights exist independently of security interest created by contract).

Plaintiff is correct that a surety's interests as subrogee sound in equity, not contract law, and Article 9 is therefore inapplicable here. As Professors White and Summers have written with respect to sureties to construction contracts,

> Article 9 applies only to consensual security interests. The surety's subrogation claim is not consensual, but is based on the "status . . . inhering in a surety." Accordingly, conflicts between the rights of the surety and third parties must be resolved outside Article 9. And outside Article 9, sureties generally prevail over banks with perfected Article 9 security interests in money retained by the owner.

4 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 30-6 (5th ed. 2002) (quoting *Nat'l Shawmut Bank*, 411 F.2d at 846.); *see also Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962) ("The right of subrogation is not founded on contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties." (quoting *Memphis & L.R.R. Co. v. Dow*, 120 U.S. 287, 301-302, 7 S. Ct. 482, 488, 489, 30 L.Ed. 595 (1887)); Michele L. Killebrew, *Whose Money Is It? The Surety's Claim Against Its Principal's Bank*, DRI FOR THE DEFENSE, March 2008, *available at* 50 No. 3 DRIFTD 36 (discussing limitations on a bank's set-off rights where funds are held in trust for third party). In the context of this case in particular, it is worth noting that White and Summers believed sureties should be left outside of Article 9 because "third parties who extend credit to contractors are almost always aware of the presence of a surety standing behind the contractor." 4 WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 30-6. The court concludes that Plaintiff's Fourth Amended Complaint survives this challenge, and turns to Safeco's substantive claims.

**Safeco's Conversion Claim**

In addressing Defendant's Motion to Dismiss Plaintiff's Third Amended Complaint, Plaintiff failed to respond to Defendant's argument that the set-off funds constituted "specific chattel," a necessary element of a common law claim for conversion.[1] *In re Thebus*, 108 Ill. 2d 255, 259-60, 483 N.E.2d 1258, 1260 (1985). To be a specific chattel, money need not be "segregated or earmarked," but it must at least be "a specific fund or specific money in coin or bills," of "determinate amount and identifiably distinct." *Doing Steel, Inc. v. Castle Constr. Corp.*, No. 02 C

---

[1] To state a claim for conversion under Illinois law, the Plaintiff must establish that (1) it has a right to a certain property, (2) that it has a present and unconditional right to immediate possession of the property, (3) that defendant wrongfully and without authorization assumed control, dominion, or ownership over the plaintiff's property, and (4) that the plaintiff made a demand for the return of that property. *Van Diest Supply Co. v. Shelby County State* Bank, 425 F.3d 437, 438 (7th Cir. 2005) (citing *Cirrincione v. Johnson*, 184 Ill. 2d 109, 114, 703 N.E.2d 67, 70 (1998)).

1674, 2003 WL 21254345, at *2 (N.D. Ill. May 23, 2003); *see Horbach v. Kaczmarek*, 288 F.3d 969, 975 (7th Cir. 2002) ("In order to establish the conversion of money under Illinois law, a plaintiff must show that he had 'a right to a specific fund or specific money in coin or bills." *Sutherland v. O'Malley*, 882 F.2d 1196, 1200 (7th Cir.1989)). As this court observed in its order of August 26, 2008, "[a]s a rule, when money is deposited with a bank, title to it passes and the bank becomes a debtor to the extent of the deposit; and to that extent, the depositor becomes a creditor." *Id.* (quoting *Mid-City Nat'l Bank v. Mar Bldg. Corp.*, 33 Ill. App. 3d 1083, 1089, 339 N.E.2d 497, 502 (1975)); *see Gluth Bros. Const. Inc. v. Union Nat. Bank*, 166 Ill. App. 3d 18, 23, 518 N.E.2d 1345, 1349 (2d Dist. 1988). Because money representing a general debt or obligation is not a specific piece of chattel, bank account funds, even when held in trust for a third party, typically cannot be the basis for a conversion claim by the trustee or by the trust's beneficiary. *Katz v. Belmont Nat'l Bank of Chicago*, 112 Ill.2d 64, 68, 491 N.E.2d 1157, 1159 (1986); *see Thebus*, 108 Ill.2d at 260-61, 483 N.E.2d at 1261 (conversion actions "will not lie for money represented by a general debt or obligation. It must be shown that the money claimed . . . at all times belonged to the plaintiff and that the defendant converted it to his own use.")

Plaintiff has responded to this general rule by identifying an exception, namely, that bank account funds may support a claim for conversion when they are separate and specifically identifiable from funds constituting general debt. *See Bill Marek's The Competitive Edge, Inc. v. Mickelson Group, Inc.,* 346 Ill .App. 3d 996, 1005, 806 N.E.2d 280, 287 (2d Dist. 2004) (distinguishing funds that are a portion of defendant's own assets and which it is obligated to use to satisfy a debt to plaintiff from specific funds transferred to defendant from an outside source and therefore identifiable). To the extent that deposits are identifiable as issuing from an outside source, they are separable from the general debt owed by a bank to its account holder. *See Roderick Development Investment Co. v. Community Bank of Edgewater*, 282 Ill. App. 3d 1052, 1059 668 N.E.2d 1129, 1129 (1st Dist. 1996) (holding that a plaintiff may maintain an action

against a bank for converting funds—which a third party had entrusted to the bank to convey to the plaintiff—to the bank's own use, given that the bank was not the plaintiff's debtor with respect to those funds). Each of the deposits to ICTC's account represented a discrete amount deposited to ICTC's account from an outside source identified in the Defendant's own records. Further, Defendant's records reveal the exact amount set off from these deposits, often on the very day of transfer. (Bank Statements, Ex. F to 3d Am. Compl.) There is thus no difficulty in determining which amounts constituted the allegedly wrongfully converted trust funds.

In addition to establishing that the converted property constitutes "specific chattel," an action for conversion also requires the plaintiff to show that it has a present and unconditional right to possession of the converted property, that defendant has substantially interfered with that right, and that plaintiff has made an unsuccessful demand for the property's return. *See Cirrincione*, 184 Ill. 2d at 114, 703 N.E.2d at 70. As trustee, ICTC had an immediate and unconditional right to the allegedly wrongfully set-off funds. *See Safeco*, 2008 WL 216396, at *2 ("[W]hen a trustee deposits trust funds into a bank account, only the trustee, not the beneficiary, has an immediate and unconditional right to possess the amount deposited." (citing *Katz* 112 Il. 2d at 69, 491 N.E.2d at 1159)). Plaintiff, as subrogee to ICTC's rights as trustee, asserts ICTC's present right to the specific amounts set off from progress payment deposits made by the project owners and which were to be held in trust for the projects' subcontractors and suppliers. As explained in detail below, the court concludes Plaintiff has now sufficiently alleged that the Bank had actual or constructive knowledge that the set-off funds were trust funds at the time of set-off. Finally, Plaintiff alleges that around March 29, 2007, "Safeco, as assignee and subrogee of ICTC . . . demanded possession of the aforesaid funds totaling $515,000.00 from Wheaton Bank." (4th Am. Compl. ¶ 41.) Plaintiff has sufficiently pleaded a claim for conversion under Illinois law.

**Safeco's Constructive Trust Claim**

If a bank sets off a depositor's indebtedness with funds it knows are held in trust to a third

party, it has acted wrongfully in appropriating the property of another and a constructive trust is the proper remedy. *Gluth Bros.*, 166 Ill. App. 3d at 25-26, 518 N.E.2d at 1352 (imposing constructive trust where defendant bank set off funds from account of in-debt depositor that it knew were being held in trust for third party). In its first three attempts to assert a claim for a constructive trust, Plaintiff failed to allege that Defendant knew the set-off funds constituted trust funds, a necessary element of the claim.[2] In its opinion of August 26, 2008, however, this court found that Plaintiff's Third Amended Complaint had cured this defect. (Memorandum Opinion and Order, August 26, 2008, at 2.) Specifically, Plaintiff claimed Defendant knew that the projects were public construction projects subject to the Miller Act and that its investigation of ICTC's business and its dealings with ICTC leading up to the approval of the loan alerted it to the fact that the deposits were trust funds. (4th Am. Compl. ¶¶ 19-30, 46.) In its latest Complaint, Plaintiff restates those allegations and cites to documents pertaining to Defendant's review and approval of ICTC's request for a loan. The attached exhibits include a Commitment Letter from Defendant to ICTC and detailed correspondence among Bank officers, between Bank officers and ICTC, and between Bank officers and project owners, all tending to show that Defendant did have knowledge that the funds it set off were held in trust by ICTC on behalf of various subcontractors. (4th Am. Compl. ¶¶ 19-21, 30, 46.)

Plaintiff has also offered for the first time the deposition testimony of James Sideris, the controller and Vice-President of Finance for ICTC, taken in a separate case, *Safeco Ins. Co. v. Renn*, No. 07 C 3024, (N.D. Ill. May 30, 2007) (hereinafter, the "*Renn* Litigation")[3] to which

---

[2] A constructive trust is a remedial device, by which a court may declare that a person wrongfully in possession of property is a constructive trustee, with the sole and immediate duty to transfer title and possession to the property's rightful owner. *Suttles v. Vogel*, 126 Ill. 2d 186, 193, 533 N.E.2d 901, 904 (1988).

[3] In May 2007, Safeco brought suit for breach of an indemnity agreement after defendant contractor refused to reimburse Safeco for losses and expenses relating to Safeco's
(continued...)

Defendant was not a party. (4th Am. Compl. ¶ 22.) The excerpts from Mr. Sideris's testimony show that he dealt with Scott Brown, a Senior Vice President at the Bank, and Stacy Huels, the Bank's President, in negotiating the terms of the Bank's loan. (4th Am. Compl. ¶¶ 22-23.) Mr. Sideris testified that in the course of negotiations, he supplied the Bank with audited financial statements about the nature of ICTC's business, including the existence of bonded public construction projects involving the federal government. (*Id.* ¶ 23.) Mr. Sideris testified that ICTC's line of credit with the Bank was structured to distinguish bonded from non-bonded accounts receivable and permitted ICTC to borrow 80 percent against non-bonded contracts but just 50 percent on bonded contracts. (*Id.*) According to Mr. Sideris's testimony, following the establishment of a banking relationship with the Bank, ICTC sent quarterly financial statements and monthly accounts receivable and payable to Defendant, identifying the project owners who were sources of these receivables. (*Id.* ¶¶ 23-24.) Finally, Mr. Sideris testified that he worked with Bill Reidinger, a surety broker at Safeco, in procuring bonds for the projects at issue.

Finally, Plaintiff has included the subpoenaed deposition testimony of Stacy Huels, the CEO and President of the Bank, also taken in the course of the *Renn* Litigation. (*Id.* ¶ 27.) Consistent with Mr. Sideris's testimony, Mr. Huels testified that the Bank distinguishes between bonded and non-bonded accounts receivable with respect to loans to ICTC because "[t]hose accounts receivables that are bonded are generally considered taint in the bank's eyes in that it's not clean collateral" and "[b]ecause there's a bonding relationship." (*Id.* ¶ 28; Huels Dep. 19:20-24, Ex. D4 to Pl. 4th Am. Compl.) In addition, Mr. Huels testified that he, along with Mr. Brown, handled ICTC's account with the Bank, that he understood ICTC to be a general contracting business, and that he

---

[3](...continued)
issuance of surety bonds on behalf of defendant's company. The Bank was not a party to the suit, but the plaintiff successfully subpoenaed the depositions of Stacy Huels, its President, and James Sideris, its former controller and Vice President of Finance. The case is still pending. *See Safeco Ins. Co. v. Renn*, 07-cv-03024 (N.D. Ill. May 30, 2007).

was aware that ICTC performed construction contracts that were contingent on the ability to obtain bonding. (*Id.* ¶ 28.) Finally, Mr. Huels testified that he had a relationship with Bill Reidinger: Mr. Huels stated that he had known Mr. Reidinger for eleven years, that Mr. Reidinger helped arrange the banking relationship between ICTC and Defendant, and that Mr. Reidinger had been involved with every bond ICTC had obtained since its inception. (*Id.* ¶ 27.)

Considered in the light most favorable to Plaintiff, Mr. Sideris's and Mr. Huels's testimony, the ICTC loan documents, the Bank's own correspondence, and ICTC's financial statements and accounts receivable (which it provided to the Bank) tend to support Plaintiff's allegations that Defendant knew the funds deposited into ICTC's account were trust funds when it chose to apply them to ICTC's debt. (*See* 4th Am. Compl. ¶ 29.) At a minimum, Plaintiff's allegations are sufficient to state a claim for constructive trust.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss Plaintiff's Fourth Amended Complaint [78] is denied. Defendant is directed to file its answer within 21 days.

ENTER:

Dated: August 4, 2009

_____
REBECCA R. PALLMEYER
United States District Judge